1
2
3
4
5
6
7
8
9        UNITED STATES DISTRICT COURT
10        FOR THE EASTERN DISTRICT OF CALIFORNIA
11

LISA SWAIN, an individual on behalf of        No.  1:21-cv-00197-SKO
herself and others similarly situated,

Plaintiff,        **ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CONDITIONAL CLASS CERTIFICATION**

v.

ANDERS GROUP, LLC,        (Doc. 18.)

Defendant.

This matter is before the court on Plaintiff's motion for preliminary approval of a class action settlement and conditional certification of settlement class filed on January 18, 2022.  (Doc. 18.)  Pursuant to General Order No. 617 addressing the public health emergency posed by the COVID-19 pandemic, Plaintiff's motion was taken under submission on the papers.  (Doc. 19.)  On September 12, 2022, the parties consented to the jurisdiction of the U.S. Magistrate Judge.  (*See* Docs. 26–28.)

For the reasons explained below, the Court will grant preliminary approval of the proposed class action settlement and conditional certification of the settlement class.

## I.        BACKGROUND

Defendant Anders Group, LLC ("Anders") is a healthcare staffing company that employs

1

non-exempt hourly healthcare professionals ("travelers") for travel assignments at healthcare facilities throughout the United States. (Doc. 13 ¶ 11.) The travelers sign assignment contracts with Anders that require them to work a minimum number of hours per week. (*Id*. ¶ 12.) In addition to providing an hourly wage, Anders provides travelers with weekly per diem pay (the "per diem pay"). (Doc. 13 ¶ 12; Doc. 18-1 at 8.) Although Anders labels the per diem pay as "meal and lodging per diems," Plaintiff contends that the per diem pay "is earned each week based on, and in proportion to, satisfaction of the weekly hours requirements," and if travelers "fail to satisfy their weekly hours, the weekly per diem will be prorated based on the hours worked." (Doc. 13 ¶¶ 14–15.) Thus, the weekly per diem pay is "not based upon the actual housing and meal and incidental expenses incurred but instead is based upon, and varies with, the number of weekly hours actually worked" by the travelers. (*Id*. ¶ 16.)

Plaintiff and the putative class and collective members are or were employed as travelers by Anders. (Doc. 13 at ¶¶ 21–22; Doc. 18-1 at 8.) Plaintiff contends that, notwithstanding that the amount of weekly per diem pay is based on the number of hours worked by a traveler, Anders does not include the value of the per diem in determining that traveler's regular rate of pay when calculating overtime wages. (*Id*. at ¶ 17.) Based on these allegations, Plaintiff asserts the following claims: (1) class action claims for failure to pay overtime in violation of California Labor Code §§ 510 and 1194; (2) class action claims for unfair business practices in violation of California Business and Professions Code § 17200 *et seq*.; (3) class action claims for waiting time penalties in violation of California Labor Code §§ 201–203; (4) collective claims for violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 207 and 216; and (5) penalties under the Private Attorneys General Act (PAGA), California Labor Code § 2698 *et seq*. (Doc. 13 at 6–9.)

After the lawsuit was filed, the parties "engaged in discovery regarding the policies challenged in this lawsuit, Anders' defenses to liability and class certification, and the potential damages owing to members of the putative class," including "the average hourly wage paid to putative class members throughout the class period," "the average weekly meals and incidental and lodging per diems payments paid to putative class members throughout the class period," and "all weekly payroll data for a random sampling of one-third of the putative class members." (Doc. 18-

3 at ¶¶ 11–13.)  The parties engaged in private mediation with Lisa Klerman, Esq., who Plaintiff's counsel describes as "an experienced wage & hour class-action mediator." (Doc. 18-1 at 10; Doc. 18-2 at ¶ 16.)  At the conclusion of the mediation, the parties agreed in principle to settle the action, and over the next few months continued to negotiate the terms of a settlement agreement, ultimately executing a "Joint Stipulation and Settlement Agreement" (the "Settlement Agreement"). (Doc. No. 18-1 at 10–11; Doc. 18-4.)  On January 18, 2022, Plaintiff filed the pending unopposed motion for conditional certification and preliminary approval of the class action settlement.[1] (Doc. 18.  *See* Doc. 20 (Anders' statement of non-opposition).)

## II.      THE PROPOSED SETTLEMENT

### A.      The Class

For settlement purposes, the parties request approval of the following class (the "Class") of an estimated 150 individuals (the "Settlement Class Members" or "Settlement Class"): "[a]ll non-exempt employees employed by Defendant [Anders Group, LLC] in California who, at any time between February 17, 2017 and February 13, 2022, worked one or more workweeks in which they were paid overtime and received per diem pay."[2] (Doc. 18-1 at 11; Doc. 18-4 at 14.)

### B.      Aggrieved Employees Under the PAGA

Plaintiff has defined "Aggrieved Employees" as "all non-exempt employees employed by Defendant [Anders Group, LLC] in California at any time between February 17, 2020 and February 13, 2022." (Doc. 18-4 at 3.)  Twenty-five percent of the civil PAGA penalties will be paid to the Aggrieved Employees as part of their PAGA payment share, as described below. (*Id*. at 18.)

### C.      The Settlement Period

For settlement purposes, the parties have defined the "Settlement Class Period" as the time period of "February 17, 2017 through February 13, 2022." (Doc. 18-4 at 11.)  By contrast, the relevant period for the PAGA claims is February 17, 2020, through February 13, 2022. (*Id*. at 18; *see also* Doc. 18-1 at 14.)

---

[1] On September 12, 2022, the parties consented to the jurisdiction of the U.S. Magistrate Judge, whereupon the motion was reassigned to the undersigned. (*See* Docs. 26–28.)

[2] The Settlement Agreement does not provide for certification and settlement of the FLSA claim.  Instead, it provides that Plaintiff will dismiss without prejudice the FLSA claim alleged in the operative complaint. (*See* Doc. 18-4 at 20.)

1    **D.      The Release of Claims**

2          The Settlement Agreement defines the Released Claims as:

3          all claims that have been alleged or could have been alleged based on the facts
           alleged in the operative complaint, which arose during the Settlement Class Period,
4          including but not limited to, failure to pay wages/overtime, failure to provide
5          accurate itemized wage statements, failure to pay all wages due upon separation of
           employment, waiting time penalties, violation of Business and Professions Code
6          section 17200, PAGA penalties arising from the violations alleged, violations of
           Labor Code sections 200, 201, 201.3, 202, 203, 204, 226, 226(a), 510, 558, 1194,
7          2698 et seq, Code of Civil Procedure section 1021.5, and applicable IWC Wage
8          Orders.

9    (Doc. 18-4 at 9.)   The Settlement Agreement provides, upon the settlement administrator's

10   disbursement of the settlement payments, "Participating Settlement Class Members will be deemed

11   to have, and by operation of the Order of Final Approval will have, expressly and irrevocably

12   released, acquitted, and forever discharged Defendant [Anders Group, LLC], Defendant's affiliated

13   companies, customers, and clients, and their respective parent companies, subsidiaries, affiliates,

14   shareholders, members, agents (including, without limitation, any investment bankers, accountants,

15   insurers, reinsurers, attorneys and any past, present or future officers, directors and employees)

16   predecessors, successors, and assigns, from all Released Claims."  (*Id.* at 25.)

17   **E.      Summary of the Settlement Terms**

18          Under the proposed settlement, Anders will pay a total of $368,500 (the "Gross Settlement

19   Amount" or "GSA") allocated as follows: (1) up to $92,125 (25% of the GSA) for attorney's fees

20   and up to $15,000 for litigation costs; (2) $5,000 incentive award for Plaintiff; (3) $35,000 in civil

21   PAGA penalties, with $26,250 of the penalties payable to the California Labor and Workforce

22   Development Agency ("LWDA");[3] and (4) up to $20,000 for settlement administration costs.  (Doc.

23   18-4 at 5, 15, 17–18; *see also* Doc. 18-1 at 11–13.)  The GSA excludes all employer payroll tax

24   withholdings, which will be paid by Anders separately.  (Doc. 18-4 at 6; *see also* Doc. 18-1 at 11.)

25   The funds in the GSA are non-reversionary.  (Doc. 18-4 at 5, 15; *see also* Doc. 18-1 at 8, 11.)

26

27   [3] Pursuant to the PAGA, 75% of the civil PAGA penalties, or $26,250, will go to the LWDA, and 25%, or $8,750, will
     be allocated to the net settlement amount ("Net Settlement Amount" or "NSA").  (Doc. 18-4 at 8–9, *see also* Doc. 18-
28   1 at 13.)  *See* Cal. Lab. Code § 2699(i).

Assuming these allocations are awarded in full, approximately $210,125 (the "Net Settlement Amount" or "NSA") will be available for distribution to Settlement Class Members who do not submit a timely and valid election not to participate in the settlement ("Participating Settlement Class Members").  (Doc. 18-4 at 6, 8–9; *see also* Doc. 18-1 at 13.)  From the NSA, each Participating Settlement Class Member's share will be calculated on a *pro rata* basis based on the number of overtime hours worked within the Settlement Class Period.  (Doc. 18-4 at 16; *see also* Doc. 18-1 at 14.)  Each Settlement Class Member's share of the settlement will be calculated by multiplying the NSA (less the $8,750 in PAGA penalties payable only to the "Aggrieved Employees") by a fraction, the numerator of which is the individual class member's overtime hours worked during the settlement class period, and the denominator of which is aggregate number of overtime hours worked during the settlement class period by the entire settlement class.  (*Id*.)  Members of the Settlement Class who qualify as "Aggrieved Employees" under the PAGA will additionally receive a *pro rata* share of the $8,750 in PAGA penalties payable to the class based on the overtime hours worked between February 17, 2020, and February 13, 2022.  (Doc. 18-4 at 18–19; *see also* Doc. 18-1 at 14.)

Participating Settlement Class Members are not required to submit a claim form in order to receive their *pro rata* share of the NSA.  (Doc. 18-4 at 16–17.)  Instead, unless an individual chooses to affirmatively opt-out, each Participating Settlement Class Member will automatically receive their *pro rata* share of the NSA.  (*Id*.)  Plaintiff estimates that Participating Settlement Class Members will receive an average recovery of $1,400.[4]  (Doc. 18-3 at ¶ 22.)

Class Members who do not wish to participate in the settlement or object thereto must give notice within sixty days of the Settlement Administrator mailing out Notice Packets.  (Doc. 18-4 at 22–23.)  The *pro rata* shares of those settlement class members who choose to opt-out or object will be redistributed on a *pro rata* basis to Participating Settlement Class Members.  (*Id*. at 17.)

Settlement checks will remain valid for one hundred eighty days.  (Doc. 18-4 at 20.)  Uncashed funds will be deposited with the State of California Controller's Office pursuant to the

---

[4] Plaintiff is directed to provide an updated estimate in the motion for final approval.

California's Unclaimed Property Law.  (*Id*.)

If ten percent or more of the Class Members opt-out of the settlement, Anders may elect to rescind the settlement, such that the settlement will become null and void.  (Doc. 18-4 at 27.) Anders must exercise this option within fourteen calendar days of expiration of the opt-out period. (*Id*.)

## III.    LEGAL STANDARD

### A.    Rule 23 Settlements

Class actions require the approval of the district court before settlement.  Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval.").  "Approval under 23(e) involves a two-step process in which the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc*., 221 F.R.D. 523, 525 (C.D. Cal. 2004).

The first step in the two-step process is preliminary approval.  During preliminary approval, the court conducts a preliminary fairness evaluation to determine if notice of the class action settlement should issue to class members and, if applicable, whether the proposed settlement class should be certified.  *See* David F. Herr, *Ann. Manual Complex Lit.* § 21.632 (4th ed.).  Under Rule 23(e)(1), the court must direct notice to all class members who would be bound by the settlement proposal if the parties show that "the court will likely be able to:" (i) approve the proposal under Rule 23(e)(2)'s fair, reasonable, and adequate standard; and (ii) certify the proposed settlement class.  Fed. R. Civ. P. 23(e)(1); *see also Lounibos v. Keypoint Gov't Sols. Inc*., No. 12-cv-00636-JST, 2014 WL 558675, at *5 (N.D. Cal. Feb. 10, 2014) (quoting *In re Tableware Antitrust Litig*., 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)) (noting that federal courts generally grant preliminary approval if "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval").

The second step is the final approval.  During final approval, "[i]f the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  In doing so, the court must consider several factors, including whether: "the class representatives and class counsel have adequately represented the class"; "the proposal was negotiated at arm's length"; "the proposal treats class members equitably relative to each other"; and "the relief provided for the class is adequate." *Id*.  When considering whether "the relief provided for the class is adequate," the court should also take into account:

    (i)    the costs, risks, and delay of trial and appeal;

    (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

    (iv)    any agreement required to be identified under Rule 23(e)(3).

*Id*.  In addition to the two-step review process, Rule 23(e) also requires that: (i) the parties seeking approval file a statement identifying the settlement agreement; (ii) class members be given an opportunity to object; and (iii) no payment be made in connection with forgoing or withdrawing an objection, or forgoing, dismissing, or abandoning an appeal. Fed. R. Civ. P. 23(e)(3), (5).

"Courts have long recognized that settlement class actions present unique due process concerns for absent class members." *In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks and citations omitted).  To protect the rights of absent class members, Rule 23(e) requires that the court approve such settlements "only after a fairness hearing and a determination that the settlement is fair, reasonable, and adequate." *Id*. at 946.  When approval is sought of a settlement negotiated before formal class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *Id*.  In such circumstances, the "settlement approval requires a higher standard of fairness" and a "more exacting review" so as "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to

represent." *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (internal quotation marks and citations omitted). Rule 23 also "demand[s] undiluted, even heightened, attention" to the certification requirements when class certification is sought only for purposes of settlement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Accordingly, the district court must examine the propriety of certification under Rule 23 both at this preliminary stage and at a later fairness hearing. *See, e.g., Ogbuehi v. Comcast*, 303 F.R.D. 337, 344 (E.D. Cal. Oct. 2, 2014).

**B.     PAGA Settlements**

Under the PAGA, an "aggrieved employee" may bring an action for civil penalties for labor code violations on behalf of herself and other current or former employees. Cal. Lab. Code § 2699(a).[5] A plaintiff suing under the PAGA "does so as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009). Thus, a judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Id.*

The PAGA statute imposes several limits on litigants. First, because a PAGA action functions as a "substitute" for an action brought by the state government, a plaintiff suing under PAGA is limited to recovery of civil penalties only, rather than damages or unpaid wages available privately through direct or class action claims. *Iskanian v. CLS Transportation L.A., LLC*, 59 Cal. 4th 348, 381 (2014); *ZB, N.A. v. Superior Court*, 8 Cal. 5th 175, 182, 193 (2019), *rev'd in part on other grounds*, *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022). Second, to bring an action under PAGA, an aggrieved employee must first provide written notice to the LWDA as well as to the employer. Cal. Lab. Code § 2699.3(a)(1). Third, any civil penalties recovered must be divided 75% with the LWDA and 25% with the aggrieved employees. *Id.* § 2699(i). Fourth, and finally, the proposed settlement must be submitted to the LWDA, and a trial court must "review and approve" any settlement of PAGA claims. *Id.* § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (citation omitted) (noting that because settling a PAGA claim "compromises a claim that could otherwise be brought be the state," it

---

[5] An "aggrieved employee" is defined as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." Cal. Lab. Code § 2699(c).

1   requires that a court "review and approve any settlement of any civil action pursuant to [PAGA]").

2          Although there is no binding authority setting forth the proper standard of review for PAGA

3   settlements, California district courts "have applied a Rule 23-like standard, asking whether the

4   settlement of the PAGA claims is fundamentally fair, adequate, and reasonable in light of PAGA's

5   policies and purposes." *Haralson*, 383 F. Supp. 3d at 972 (internal quotation marks omitted).  This

6   standard is derived principally from the LWDA itself.  In commenting on a proposed settlement

7   including both class action and PAGA claims, the LWDA offered the following guidance:

8
9          It is thus important that when a PAGA claim is settled, the relief provided for under
           the PAGA be genuine and meaningful, consistent with the underlying purpose of
10         the statute to benefit the public and, in the context of a class action, the court
           evaluate whether the settlement meets the standards of being "fundamentally fair,
11         reasonable, and adequate" with reference to the public policies underlying the
           PAGA.
12
13  *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA's

14  guidance with approval).[6]  Recognizing the distinct issues presented by class actions, this Court is

15  persuaded by the LWDA's reasoning in *O'Connor* and therefore adopts its proposed standard in

16  evaluating the PAGA portion of the settlement now before the court.  *See, e.g., Castro v. Paragon

17  Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2020 WL 1984240, at *6 (E.D. Cal. Apr. 27, 2020);

18  *Patel v. Nike Retail Servs., Inc.*, No. 14-cv-04781-RS, 2019 WL 2029061, at *2 (N.D. Cal. May 8,

19  2019).  Accordingly, the Court will approve a settlement of PAGA claims upon a showing that the

20  settlement terms (1) meet the statutory requirements set forth by the PAGA; and (2) are

21  fundamentally fair, reasonable, and adequate in view of the PAGA's public policy goals.

22         When a proposed settlement involves overlapping class action and PAGA claims, courts

23  may employ a "sliding scale" in determining if the proposed settlement is "fundamentally fair,

24  reasonable, and adequate with reference to the public policies underlying the PAGA." *O'Connor*,

25  201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*); *McClure

26  v. Brand Energy Serv.*, LLC, No. 2:18-cv-01726-KJM-AC, 2021 WL 2168149, at *10 (E.D. Cal.

27  ───────────────
    [6] The LWDA has also stated that it "is not aware of any existing case law establishing a specific benchmark for PAGA
28  settlements, either on their own terms or in relation to the recovery on other claims in the action."  *O'Connor v. Uber
    Techs., Inc.*, No. 3:13-cv-03826-EMC (N.D. Cal. Jul. 29, 2016) (Doc. 736 at 2–3).

May 27, 2021) (same); *Cooks v. TNG GP*, No. 2:16-cv-01160-KJM-AC, 2020 WL 5535397, at *9–10 (E.D. Cal. Sept. 15, 2020) (same).  As the district court in O'Connor explained:

> For example, if the settlement for the Rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled. By providing fair compensation to the class members as employees and substantial monetary relief, a settlement not only vindicates the rights of the class members as employees, but may have a deterrent effect upon the defendant employer and other employers, an objective of PAGA. Likewise, if the settlement resolves the important question of the status of workers as employees entitled to the protection of the Labor Code or contained substantial injunctive relief, this would support PAGA's interest in "augmenting the state's enforcement capabilities, encouraging compliance with Labor Code provisions, and deterring noncompliance."

*Id*. at 1134–1135 (quoting the LWDA's guidance).  At the same time, where "the compensation to the class amounts is relatively modest when compared to the verdict value, the non-monetary relief is of limited benefit to the class, and the settlement does nothing to clarify [aggrieved workers' rights and obligations], the settlement of the non-PAGA claims does not substantially vindicate PAGA."  *Id*. at 1135.  Finally, "where plaintiffs bring a PAGA representative claim, they take on a special responsibility to their fellow aggrieved workers who are effectively bound by any judgment."  *Id*. at 1134.  Plaintiff's special responsibility to other aggrieved workers is especially significant because the "PAGA does not require class action procedures, such as notice and opt-out rights."  *Id*.  Thus,

> [t]he Court must be cognizant of the risk that despite this responsibility, there may be a temptation to include a PAGA claim in a lawsuit to be used merely as a bargaining chip, wherein the rights of individuals who may not even be members of the class and the public may be waived for little additional consideration in order to induce the employer to agree to a settlement with the class.

*Id*.

## IV.      ANALYSIS

### A.      Preliminary Class Certification

#### 1.      Rule 23(a) Requirements

The class action is a procedural mechanism whereby the "usual rule that litigation be conducted by and on behalf of the named parties only" is swept aside so that multiple parties—

unwieldy in number but possessing similar or identical claims—may pursue common redress in an efficient and economical manner. *Comcast v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted). Here, the parties seek preliminary certification of the proposed class under Federal Rule of Civil Procedure 23, which controls class certification and imposes a two-step process in deciding whether a class may be certified.

First, Rule 23(a) requires the moving party to demonstrate the existence of four prerequisites: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. *See Lozano v. AT&T Wireless Services, Inc*., 504 F.3d 718, 730 (9th Cir. 2007). If, and only if, a putative class satisfies these four requirements may it then proceed to show it also satisfies the requirements of Rule 23(b). The party seeking class certification bears the burden of establishing conformity with these two rules and must do so by producing facts "affirmatively demonstrat[ing]" that certification is warranted. *Comcast*, 569 U.S. at 33. Only after conducting a "rigorous analysis" of these facts and determining they show "actual, [and] not presumed, conformance" with Rule 23(a) and (b), may a district court certify a class. *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 981 (9th Cir. 2011) (citation omitted); *see also Patel v. Nike Retail Servs., Inc*., Case No. 14-cv-4781-RS, 2016 WL 1241777, at *3 (N.D. Cal. Mar. 29, 2016) ("This 'rigorous' analysis applies both to Rule 23(a) and Rule 23(b)."). If a court decides to certify a class, it must define the class claims and issues and appoint class counsel. Fed. R. Civ. P. 23(c)(1), (g).

> a.    Numerosity

A proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The numerosity requirement demands "examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). Although courts have found that a class of 40 individuals is sufficient under Rule 23, this metric is not a bright line requirement. *Rannis v. Recchia*, 380 Fed. App'x. 646, 651 (9th Cir. 2010) ("The numerosity requirement is not tied to any fixed numerical threshold .... In general, courts find the numerosity requirement satisfied when a class includes at least 40 members."). Courts have found the numerosity requirement satisfied when the class comprises as few as thirty-nine members or where joining all class members would serve only to impose financial burdens

and clog the court's docket.  *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citation omitted) (discussing Ninth Circuit thresholds for numerosity and listing cases). Here, Plaintiff estimates that there are approximately 150 members in the Settlement Class.  (Doc. 18-1 at 11; *see also* Doc. 18-3 at ¶ 21.)  This showing with respect to numerosity is adequate to meet the requirements of Rule 23(a)(1).

### b.    Commonality

Rule 23(a) also requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To satisfy the commonality requirement, the class representatives must demonstrate that common points of facts and law will drive or resolve the litigation.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  "[C]ommonality requires that the class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke," and the "plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation."  *Mazza v. Am. Honda Motor Co.,* 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Wal-Mart,* 564 U.S. at 350).  For example, "[c]ommonality is generally satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members."  *Benitez v. W. Milling*, LLC, No. 1:18-cv-01484-SKO, 2020 WL 309200, at *5 (E.D. Cal. Jan. 21, 2020) (internal quotation marks and citations omitted).

The rule does not require all questions of law or fact to be common to every single class member and "[d]issimilarities among class members do not [necessarily] impede the generation of common answers to those questions[.]"  *Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) (noting that commonality can be found through "[t]he existence of shared legal issues with divergent factual predicates"). However, the raising of merely any common question does not suffice.  *See Wal-Mart*, 564 U.S. at 349 ("Any competently crafted class complaint literally raises common 'questions.'") (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–32 (2009)).

Plaintiff contends that the class claims "hinge on a single common contention that is capable

12

of classwide resolution."  (Doc. 18-1 at 17.)  The crux of Plaintiff's argument is that Anders unlawfully excluded per diem payments from the regular rate of pay because they are "based on the quantity of work performed and thus function to compensate for hours worked rather than reimburse for expenses incurred."  (*Id*.)  Given that the proposed class in this case is composed of travelers who worked overtime and had the value of their per diems excluded from their regular rate, there exists a common factual question about whether Anders intentionally adopted a policy to exclude the value of the per diem benefits from the regular rates when calculating overtime.  Moreover, there exists a common question of law as well: Does Anders' policy of tying a traveler's weekly per diem to the number of hours they worked in a week necessitate including the value of the per diem in her regular rate when calculating overtime?  The Court concludes that commonality is therefore satisfied here because the claims of all proposed class members "will stand or fall on whether the value of the per diem is a part of the regular rate when calculating overtime." *Carlino v. CHG Med. Staffing, Inc*., No. 1:17-cv-01323-DAD-JLT, 2019 WL 1005070, at *4 (E.D. Cal. Feb. 28, 2019) (citing *Wal-Mart*, 564 U.S. at 350).

　　　　　　　　*c.*　　*Typicality*

　　"The typicality requirement looks to whether the claims of the class representatives are typical of those of the class and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citations and internal quotation marks omitted); Fed. R. Civ. P. 23(a)(3).  While representative claims must be "reasonably co-extensive with those of absent class members," they "need not be substantially identical." *Hanlon*, 150 F.3d at 1020; *see also Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992).

　　Here, Plaintiff states that she "and all other members of the settlement class alike, received housing and meals and incidentals payments which were excluded from their regular rates of pay." (Doc. 18-1 at 17–18.)  To that end, Plaintiff asserts that her claims and those of the Class Members "hinge on the common issue of whether Anders' policy of excluding the value of per diem payments from its employees' 'regular rate' violates California law." (Doc. 18-3 at ¶ 40.)

　　Because the proposed class consists of travelers, like Plaintiff, who were employed in

13

1   California, worked overtime, and had the valued of their per diems excluded from their regular rate

2   for purposes of calculating overtime pay, the court finds that plaintiff Plaintiff's claims are

3   "reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020.

4   Typicality is therefore satisfied here.

5           *d.*     *Adequacy of Representation*

6          The final Rule 23(a) prerequisite is satisfied if "the representative parties will fairly and

7   adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Resolution of this issue

8   requires the court to address the following questions: "(a) do the named plaintiffs and their counsel

9   have any conflicts of interest with other class members and (b) will the named plaintiffs and their

10  counsel prosecute the action vigorously on behalf of the class?" *Sali v. Corona Reg'l Med. Ctr.*,

11  909 F.3d 996, 1007 (9th Cir. 2018); *see also Pierce v. Cty. of Orange*, 526 F.3d 1190, 1202 (9th

12  Cir. 2008).  "Adequacy of representation also depends on the qualifications of counsel." *Sali*, 909

13  F.3d at 1007 (citation omitted).

14         Plaintiff contends that the adequacy of representation requirement is met here because she

15  there are "no known conflicts with the proposed Settlement Class" and that she and her counsel

16  have "vigorously prosecuted the action."  (Doc. 18-1 at 18; Doc. 18-3 at ¶ 41.)  Based on these

17  assertions and the above description of Plaintiff's claims, the court is satisfied that Plaintiff's

18  interests align with those of the proposed Class Members and that Plaintiff would vigorously

19  prosecute the action on behalf of the class.

20         Plaintiff's counsel also submitted a declaration to establish their adequacy as class counsel.

21  (Doc. 18-3 ("Hayes Decl.").)  Plaintiff's counsel's declaration establishes that both attorneys

22  working on this matter have significant experience in similar litigation.  (Hayes Decl. at ¶¶ 2–5.)

23         Because Plaintiff and class counsel represent that there are no conflicts of interest with the

24  Class Members and attorneys at Hayes Pawlenko LLP, Matthew B. Hayes and Kye D. Pawlenko,

25  appear to be experienced in class action litigation, the Court finds that the adequacy of

26  representation requirement has been preliminarily satisfied.

27        2.    <u>Rule 23(b)(3) Requirements</u>

28         The parties seek class certification under Rule 23(b)(3), which requires that: (1) the

14

questions of law or fact common to class members predominate over any questions affecting only individual members; and (2) a class action be superior to other available methods for fairly and efficiently adjudicating the controversy. *See Amchem*, 521 U.S. at 615; *In re Hyundai and Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (en banc). The test of Rule 23(b)(3) is "far more demanding" than that of Rule 23(a). *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623–24).

> a.      *Predominance*

First, common questions must "predominate" over any individual questions. While this requirement is similar to the Rule 23(a)(2) commonality requirement, the standard is higher at this stage of analysis. *Wal-Mart*, 564 U.S. at 359. While Rule 23(a)(2) can be satisfied by even a single question, Rule 23(b)(3) requires convincing proof that common questions "predominate" over individual questions. *Amchem*, 521 U.S. at 623–24. "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting W. Rubenstein, *Newberg on Class Actions* § 4:50, pp. 196–197 (5th ed. 2012)). "When common questions present a significant aspect of the case and can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022.

As discussed above, Plaintiff challenges Anders' "uniform" policy of excluding per diem value from the overtime calculation despite tying the per diem to hours worked. (Doc. 18-1 at 18.) Class actions in which a defendant's uniform policies are challenged generally satisfy the predominance requirement of Rule 23(b)(3). *See, e.g., Castro*, 2020 WL 1984240, at *6; *Palacios v. Penny Newman Grain, Inc.*, No. 1:14-cv-01804-KJM-SAB, 2015 WL 4078135, at *5–6 (E.D. Cal. July 6, 2015); *Clesceri v. Beach City Investigations & Protective Servs., Inc.*, No. 10-cv-03873-JLS-RZ, 2011 WL 320998, at *7 (C.D. Cal. Jan. 27, 2011). The Court therefore concludes that the predominance requirement has been met in this case.

1        *b.*        Superiority

2        Rule 23(b)(3) also requires that a court find that "a class action is superior to other available

3   methods for the fair adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  To resolve the Rule

4   23(b)(3) superiority inquiry, "the court should consider class members' interests in pursuing

5   separate actions individually, any litigation already in progress involving the same controversy, the

6   desirability of concentrating in one forum, and potential difficulties in managing the class action—

7   although the last two considerations are not relevant in the settlement context."  *See Palacios*, 2015

8   WL 4078135, at *6 (citing *Schiller v. David's Bridal Inc*., No. 10-cv-00616-AWI-SKO, 2012 WL

9   2117001, at *10 (E.D. Cal. June 11, 2012)).

10       Here, Plaintiff asserts that the superiority requirement is satisfied because "determining the

11  legality of Anders' per diem and allowance policies in a single proceeding 'will reduce litigation

12  costs and promote greater efficiency.'"  (Doc. 18-1 at 19 (quoting *Valentino v. Carter-Wallace,

13  Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).)

14       Given that "[a] common nucleus of facts and potential legal remedies" predominate, the

15  Court finds that these questions can be resolved for all members more efficiently and expeditiously

16  in a single action.  *Hanlon*, 150 F.3d at 1022.  The Court also finds that class resolution is superior

17  to other available methods for adjudication of the controversy as each member's individual pursuit

18  of the same claims would burden the judiciary.  *See Carlino*, 2019 WL 1005070, at *5.  Therefore,

19  the Court is satisfied that the superiority requirement has been met here.

20       For all the forgoing reasons, the requirements for preliminary certification under Rule 23

21  have been satisfied, and the court finds that conditional certification of the Class is appropriate.

22  **B.    Preliminary Settlement Approval**

23       Plaintiff also seeks preliminary approval of the settlement.  Under Rule 23(e), a court may

24  approve a class action settlement only if it is a fair, reasonable, and adequate resolution of the

25  dispute.  *Bluetooth*, 654 F.3d at 946.  "[P]reliminary approval of a settlement has both a procedural

26  and substantive component." *Tableware Antitrust Litig*., 484 F. Supp. 2d at 1079 (citation omitted).

27  In particular, preliminary approval of a settlement and notice to the proposed class is appropriate

28  if: (1) the proposed settlement appears to be the product of serious, informed, non-collusive

16

1   negotiations; and (2) the settlement falls within the range of possible approval, has no obvious

2   deficiencies, and does not improperly grant preferential treatment to class representatives or

3   segments of the class.  *Id*.

4         Because the proposed settlement also a PAGA component, the settlement must also meet

5   certain requirements.  The court will first address in turn whether these requirements have been

6   met.

7         1.       The PAGA Component

8         The PAGA requires that a proposed settlement be submitted to the LWDA.  Cal. Lab. Code

9   at § 2699(l)(2); *see also Haralson*, 383 F. Supp. 3d at 971 (noting that a proposed settlement should

10  be submitted to the LWDA to allow it to comment if it so desires (citing *Ramirez v. Benito Valley

11  Farms, LLC*, No. 16-cv-04708-LHK, 2017 WL 3670794, at *2 (N.D. Cal. Aug. 25, 2017))).

12        Here, Plaintiff's counsel avers that the Settlement Agreement was submitted to the LWDA

13  "concurrent with the filing of this motion."  (Doc. 18-3 at ¶ 45.)  The parties have not disclosed

14  whether the LWDA has commented on the settlement to date.[7]  The Court will address the fairness,

15  reasonableness, and adequacy of the PAGA penalties below.

16        2.       Procedural Fairness

17        Having addressed whether the applicable PAGA requirements have been met, the Court

18  must next consider whether the process by which the parties arrived at the settlement is the product

19  of arm's-length bargaining, rather than collusion or fraud.  *See Millan v. Cascade Water Servs*.,

20  Inc., 310 F.R.D. 593, 613 (E.D. Cal. 2015).  A settlement is presumed to be fair if it "follow[s]

21  sufficient discovery and genuine arm['s]-length negotiation."  *Adoma v. Univ. of Phx., Inc*., 913 F.

22  Supp. 2d 964, 977 (E.D. Cal. 2012) (citation omitted).  In addition, the parties' participation in

23  mediation "tends to support the conclusion that the settlement process was not collusive."  *Palacios*,

24  2015 WL 4078135, at *8 (citation omitted).

25        Here, as indicated above, the parties engaged in a private mediation with Lisa Klerman,

26  Esq., an experienced professional mediator, on October 6, 2021.  (Doc. 18-1 at 10.)  The mediation

27  _____

28  [7] In the motion for final approval, Plaintiff is directed to specify whether the LWDA has commented on the proposed settlement.

took place after approximately seven months of litigation, and prior to mediation, Anders provided Plaintiff's counsel with "documents and information pertaining to, among other things, the following: (1) all of Anders' policies, procedures, and practices regarding paying employees, calculating overtime, providing per diem payments, and adjusting or prorating per diems and stipends when employees fail to work minimum required weekly hours; (2) all handbooks applicable to the putative class; (3) all versions of the assignment agreements utilized by Anders during the class period; (4) the average hourly wage paid to putative class members throughout the class period; and (5) the average weekly meals and incidental and lodging per diems payments paid to putative class members throughout the class period." (Doc. 18-1 at 10; Doc. 18-3 at ¶ 13.) In addition, prior to participating in mediation, Plaintiff's counsel obtained from Anders "all weekly payroll data for a random sampling of one-third of the putative class members, as well as payroll data for the entire class reflecting the total number of overtime hours worked by each class member." (Doc. 18-1 at 10; Doc. 18-3 ¶ 14.) According to the parties' Settlement Agreement, its terms and conditions "are the result of lengthy, intensive arms-length negotiations between the [p]arties." (Doc. 18-4 at 28.) In sum, Plaintiff asserts that the settlement was the "product of an arms-length, non-collusive, negotiated resolution." (Doc. 18-1 at 21 (quoting *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).)

Based on these representations by the parties, the Court preliminarily concludes that the parties' negotiation constituted genuine, informed, and arm's-length bargaining.

        3.    <u>Substantive Fairness</u>

            *a.    Adequacy of the Settlement Amount*

In evaluating the fairness of a settlement award, "the settlement's benefits must be considered by comparison to what the class actually gave up by settling." *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1123 (9th Cir. 2020) (citing *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to [the] process [of evaluating settlements] ... is the need to compare the terms of the compromise with the likely rewards of litigation.")). However, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Mego*

*Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), *as amended* (June 19, 2000) (citation omitted).  To determine whether a settlement "falls within the range of possible approval," a court must focus on "substantive fairness and adequacy" and "consider plaintiffs' expected recovery balanced against the value of the settlement offer." *Tableware Antitrust Litig*., 484 F. Supp. 2d at 1080.

The parties have agreed to a $368,500 Gross Settlement Amount.  (Doc. 18-4 at 15.) Assuming the various allocations described earlier in this order are awarded in full, approximately $210,125 will be available for distribution to Participating Settlement Class Members.  (Doc. 18-4 at 6, 8–9; *see also* Doc. 18-1 at 13.)  The Net Settlement Amount will be distributed to the Participating Settlement Class Members on a *pro rata* and non-reversionary basis, with any uncashed funds to be donated to the California Unclaimed Property Fund.  ((Doc. 18-4 at 5, 15, 16, 20; *see also* Doc. 18-1 at 11, 14.)

Plaintiff estimates that the maximum potential damages as to the claims asserted in this action are approximately $873,857.35, making the Gross Settlement Amount of $368,500 an approximately 42% recovery of plaintiff's maximum potential claims.  (See Doc. 18-3 at ¶¶ 23–28, 36; *see also* Doc. 18-1 at 24–15.)  This settlement amount exceeds the range of the percentage recoveries that California district courts—including this court—have found to be reasonable.  *See, e.g., Singh v. Roadrunner Intermodal Servs., LLC*, No. 1:15-cv-01497-DAD-BAM, 2018 WL 2412325, at *7 (E.D. Cal. May 29, 2018), modified, No. 1:15-cv-01497-DAD-BAM, 2018 WL 4382202 (E.D. Cal. Sept. 13, 2018) (approving a settlement of about 12% of the estimated maximum damages); *Glass v. UBS Fin. Servs., Inc.*, No. 3:06-cv-04068-MMC, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26, 2007) (approving a settlement of about 25–35% of the estimated maximum).  In addition, the Court notes that the *pro rata* allocation formula employed here is fair and reasonable because each Settlement Class Member is allocated a payout that scales directly with their overtime hours worked, and any Class Member may dispute the number of overtime attributed to them.  (*See* Doc. 18-4 at 16, 23.)

Plaintiff asserts that the settlement's recovery rate is "fair and adequate when viewed in light of the risks associated with continued litigation."  (Doc. 18-1 at 23.)  The Court agrees.

According to Plaintiff, a "key issue in dispute underlying every claim in this lawsuit is whether or not Anders' housing and meals and incidentals per diem payments qualify as the type of reasonable payments for traveling expenses, or other expenses, incurred by an employee in furtherance of his employer's interest and properly reimbursable by the employer that may be excluded from the regular rate." (*Id*. at 25 (internal quotation marks omitted); *see also* Doc. 18-3 at ¶ 30.) Plaintiff asserts that the "fact that the payments are tied to the number of hours worked" weighs in her favor. (*Id*.) She notes that weighing against her is that fact that the Ninth Circuit "declined to adopt a per se rule that that per diem payments that vary with hours worked must always be included" in the regular rate of pay. (Doc. 18-1 at 25 (citing *Clarke v. AMN Servs., LLC*, 987 F.3d 848, 856 (9th Cir. 2021); see also Doc. 18-3 at ¶ 31.) Plaintiff points out that the derivative claim for waiting time penalties "faces additional risks rendering it doubtful that any waiting time penalties could actually be recovered in light of several defenses asserted by Anders," including that it is exempt from California Labor Code § 203. (Doc. 18-1 at 26; *see also* Doc. 18-3 at ¶¶ 32–34.) In addition, Plaintiff asserts that even if it ultimately prevails on its PAGA claim, it is "likely that this Court could exercise its discretion to reduce the amount of PAGA penalties ultimately awarded," given that "that the state of the law on the primary basis for liability in this lawsuit remains murky." (Doc. 18-1 at 27 (citing *Huff v. Securitas Security Servs. USA, Inc*., 23 Cal. App. 5th 745, 759 (2018); *see also* Doc. 18-3 at ¶ 35.)

While "a larger award was theoretically possible, 'the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.'" *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) (citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal citations and quotation marks omitted)). For the foregoing reasons, the Court will preliminarily approve the settlement amount reflected in the proposed settlement.

### b. PAGA Penalties

The settlement also provides for $35,000 in civil PAGA penalties. (Doc. 18-4 at 8, 18.) Pursuant to the PAGA, 75% of the civil penalties, or $26,250, will go to the LWDA, and 25%, or $8,750, will be distributed to Aggrieved Employees on a *pro rata* basis. (*Id*. at 18.) *See* Cal. Lab.

1   Code § 2699(i).

2         Plaintiff's counsel estimates a total of $65,000 in PAGA penalties in this action, which

3   counsel discounted, as described above.  (Doc. 18-3 at ¶¶ 23, 28.)  The resulting $35,000 civil

4   penalty proposed by the settlement thus represents approximately 9% of the $368,500 GSA.  The

5   amount proposed to settle the PAGA claims is consistent with, and in fact exceeds, other PAGA

6   settlements approved by this court.  *See, e.g., Syed v. M-I, LLC*, No. 1:12-cv-01718-DAD-MJS,

7   2017 WL 714367, at *13 (E.D. Cal. Feb. 22, 2017) (approving PAGA penalties representing 1.4%

8   of the gross settlement fund); *Garcia v. Gordon Trucking, Inc*., No. 1:10-cv-0324-AWI-SKO, 2012

9   WL 5364575, at *7 (E.D. Cal. Oct. 31, 2012) (approving PAGA penalties representing 0.27% of

10  the gross settlement fund); *Castro*, 2020 WL 1984240, at *15 (approving PAGA penalties

11  representing 2% of the gross settlement fund).  The Court therefore preliminarily concludes that

12  the settlement of the PAGA claims is fair, reasonable, and adequate in light of the PAGA's public

13  policy goals.  *See O'Connor*, 201 F. Supp. 3d at 1133.

14            c.     *Attorney's Fees*

15        When a negotiated class action settlement includes an award of attorney's fees, the district

16  court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is

17  reasonable, even if the parties have already agreed to an amount."  *Bluetooth*, 654 F.3d at 941; *see*

18  *also Knisley v. Network Assocs., Inc*., 312 F.3d 1123, 1125 (9th Cir. 2002) (citation omitted).

19  Where, as here, fees are to be paid from a common fund, the relationship between the class members

20  and class counsel "turns adversarial."  *In re Mercury Interactive Corp. Sec. Litig*., 618 F.3d 988,

21  994 (9th Cir. 2010) (citation omitted).  As a result, the district court must assume a fiduciary role

22  for the class members and "act with a jealous regard to the rights of those who are interested in the

23  fund in determining what a proper fee award is."  *Id*. (internal quotation marks and citations

24  omitted).

25        In evaluating the award of attorney's fees, "courts have discretion to employ either the

26  lodestar method or the percentage-of-recovery method."  *Bluetooth*, 654 F.3d at 942 (citations

27  omitted).  Under either approach, "[r]easonableness is the goal, and mechanical or formulaic

28  application of either method, where it yields an unreasonable result, can be an abuse of discretion."

1   *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

2          Under the percentage of the fund method, the court may award class counsel a percentage

3   of the common fund recovered for the class; in the Ninth Circuit, the benchmark is 25%.  *Id.* at

4   1007, 1047–48; *see also Bluetooth*, 654 F.3d at 942.  Special circumstances that could justify

5   varying the benchmark award include when counsel achieves exceptional results for the class,

6   undertakes extremely risky litigation, generates benefits for the class beyond simply the cash

7   settlement fund, or handles the case on a contingency basis.  *See In re Online DVD-Rental Antitrust*

8   *Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015).  An explanation is necessary when the court departs

9   from the 25% benchmark, *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir. 2000), but either

10   way, "[s]election of the benchmark or any other rate must be supported by findings that take into

11   account all of the circumstances of the case."  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048

12   (9th Cir. 2002).

13          With the lodestar method, the Court multiplies the number of hours the prevailing party

14   reasonably spent litigating the case by a reasonable hourly rate for counsel.  *Bluetooth*, 654 F.3d at

15   941.  The product of this computation, the "lodestar" amount, yields a presumptively reasonable

16   fee.  *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).

17          The Ninth Circuit has recommended that district courts apply one method but cross-check

18   the appropriateness of the determined amount by employing the other as well.  *See Bluetooth*, 654

19   F.3d at 944.  This diligence is particularly important "when counting all hours expended" in a case

20   "where the plaintiff has achieved only limited success" would yield an "excessive amount" of fees,

21   or when awarding a percentage of a "megafund would yield windfall profits for class counsel in

22   light of the hours spent on the case."  *Bluetooth*, 654 F.3d at 942 ("Just as the lodestar method can

23   confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate, the

24   percentage-of-recovery method can likewise be used to assure that counsel's fee does not dwarf

25   class recovery.") (internal quotation marks and citations omitted).  Similarly, an upward adjustment

26   could be justified if the recovery is "too small . . . in light of the hours devoted to the case or other

27   relevant factors."  *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th

28   Cir. 1990).

22

Here, the Settlement Agreement provides that class counsel will seek an award of 25% of the GSA, equivalent to $92,125.[8]  (Doc. 18-4 at 17–18.)  This fee amount is consistent with the benchmark rate in the Ninth Circuit.  *See In re Bluetooth*, 654 F.3d at 947.  As such, the Court will approve the attorney's fee request on a preliminary basis.  However, in connection with the final fairness hearing, the Court will consider any objections as well as the evidence presented by counsel in order to determine whether the fee award of 25% is reasonable in this case.[9]

   *d.     Incentive Payment*

"Enhancements for class representatives are not to be given routinely."  *Ogbuehi v. Comcast of California*, 303 F.R.D. 337, 352 (E.D. Cal. 2014) (*quoting Morales v. Stevco, Inc.,* No. 1:09-cv-00704-AWI-JLT, 2011 WL 5511767, at *12 (E.D. Cal. Nov. 10, 2011)).  In determining whether an enhancement award is appropriate, "[t]he district court must evaluate [the representatives'] awards [ ], using 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . [and] the amount of time and effort the plaintiff expended in pursuing litigation . . . .'"  *Staton v. Boeing Co.*,

---

[8]  The settlement also provides for up to $15,000 in litigation costs.  (Doc. 18-4 at 18.)  Plaintiff's counsel have not submitted a list of litigation expenses incurred thus far, nor any information that supports the $15,000.00 request.  Although this amount of costs is not *per se* unreasonable for counsel to have accrued in litigating a class action, *see, e.g., Castro*, 2020 WL 1984240, at *3, 19 (granting preliminary approval of a proposed settlement providing for up to $55,000.00 in litigation costs), the Court is not able to conclude on the evidence currently before it that an award of up to $15,000.00 is reasonable and necessary here.  Given the proceedings in this action, which include the filing of an amended complaint and the pending motion for preliminary approval, the Court finds that documented litigation costs of up to $10,000 would be fair, reasonable, and adequate for the purposes of preliminary approval.  *See, e.g., Alberto v. GMRI, Inc*., No. 2:07-cv-01895-WBS-DAD, 252 F.R.D. 652, 665 (E.D. Cal. 2008) (granting preliminary approval of a class action settlement in which $10,000 of the $435,000 settlement fund would be allocated to documented litigation costs, but requiring class counsel to submit an application for reimbursement of costs).  Nonetheless, Plaintiff's counsel are directed to provide an accounting for the requested $15,000.00 in litigation costs in seeking final approval of the settlement.  At that time, the court will carefully re-examine the amount of litigation costs to be awarded as part of the settlement.

[9]  Although Plaintiff's counsel asserts that the proposed settlement "is an excellent result" for the Class, the settlement negotiations were "arms-length" and "adversarial," and the requested 25% benchmark amount for attorney's fees is presumed to be reasonable, Plaintiff's counsel have not submitted any information regarding the number of hours they have spent reasonably litigating this action or their hourly rates.  (Doc. 18-1 at 20–21, 27.)  Therefore, the Court is unable to conduct a lodestar cross-check at this time.  Plaintiff's counsel are directed to provide the Court with detailed documentation pertaining to their hours spent working on this matter and their hourly rates at the final approval stage.  At that time, the Court will carefully re-examine the award of attorney's fees and conduct a lodestar cross-check.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) ("The 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases"); *Perez v. All Ag, Inc*., No. 1:18-cv-00927-DAD-EPG, 2020 WL 1904825, at *9 (E.D. Cal. Apr. 17, 2020) ("Though the court may well grant an award of that size under certain circumstances, the court cannot abdicate its obligation to protect the rights of absent members by simply defaulting to the method [of determining attorneys' fees] proffered by plaintiffs.").

327 F.3d 938, 977 (9th Cir. 2003) (*quoting Cook v. Niedert*, 142 F.3d 1004, 1016 (9th Cir. 1998)).

According to the calculations provided by Plaintiff, Participating Settlement Class Members will receive an average settlement payment of around $1,400.  (Doc. 18-1 at 13; Doc. 18-3 at ¶ 22.) Thus, an incentive award of $5,000 is roughly four times the average amount each Class Member could expect to receive from the proposed settlement.  Though this figure is not necessarily excessive, *see, e.g., Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 2214936, at *8 (E.D. Cal. May 19, 2017) (approving an incentive award of $7,500 to each class representative where average class recovery was approximately $500), the Ninth Circuit has repeatedly urged district courts to be "vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives."  *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013) (citation omitted).

Here, the benefit to the class provides significant support for the proposed award.  The Court therefore finds that an incentive payment of $5,000 to Plaintiff at this juncture is reasonable on its face, and not an impediment to preliminary approval.  However, for final approval, Plaintiff should submit evidence, such as a declaration, describing in detail her contribution to the case to ultimately justify the incentive award.[10]

> e.    *Release of Claims*

Class action settlement agreements cannot release claims of absent class members that are unrelated to the factual allegations of the class complaint.  *Hesse v. Sprint Corp.,* 598 F.3d 581, 590 (9th Cir. 2010).  Here, the Settlement Agreement provides that all Class Members who do not timely opt-out of the settlement will be deemed to have released Anders from the Released Claims, defined as claims that are "based on the facts alleged in the operative complaint, which arose during the Settlement Class Period."  (Doc. 18-4 at 9.)  As such, the settlement does not appear to release unrelated claims that Class Members may have against Anders.  The Court therefore finds that the scope of the release is satisfactory.  *See Hesse*, 598 F.3d at 590; 4 *Newberg on Class Actions* (4th

---

[10] Plaintiff has provided the Court with the average award expected from the settlement, but has not provided the Court with estimates regarding the expected median, minimum, or maximum awards.  Plaintiff is directed to provide this information in the motion for final approval of the class and collective action settlement, so that the Court may satisfy itself that the requested award is commensurate with and does not dwarf the average or median award received by the Class Members.

Ed. 2002) § 12:15, pp. 310–311 ("A clause providing for the release of claims may refer to all claims raised in the pending action, or it may refer to all claims, both potential and actual, that may have been raised in the pending action with respect to the matter in controversy.").

**C.     Proposed Class Notice and Administration**

For proposed settlements under Rule 23, "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1); *see also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement under Rule 23(e).").  For a class certified under Federal Rule of Civil Procedure 23(b)(3), the notice must contain, in plain and clear language: (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) the right of a class member to appear through an attorney, if desired; (5) the right to be excluded from the settlement; (6) the time and manner for requesting an exclusion; and (7) the binding effect of a class judgment on members of the class. Fed. R. Civ. P. 23(c)(2)(B).  A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (internal quotation marks and citations omitted).

Here, the Settlement Agreement provides that the Settlement Administrator will receive a list identifying each Class Member, culled from Anders' business records.  (Doc. 18-4 at 20–21.)  Within five business days of Anders providing that information, the Settlement Administrator will send the Notice Packets to all Class Members via first-class mail.  (*Id*. at 21.)  For mailings returned as undeliverable, the Settlement Administrator will search for a more current address by, among other things, conducting skip-tracing, and will remail the Notice of Settlement to all class members for whom new addresses are found.  (*Id*. at 22.)  In addition, the Settlement Administrator will process any opt-out requests and objections to the settlement.  (*Id*. at 23–24.)

The Notice Packet includes a "Legal Notice" that describes the class action settlement. (Doc. 18-5.)  The Notice Packet (1) describes the nature of the lawsuit and claims at issue, (2) defines the class, (3) explains the amount of the Settlement and how individual class member settlement payments will be calculated, (4) discloses all deductions that will be requested from the

Settlement for fees, costs, service awards, and settlement administration expenses, (5) details the claims that are being released, (6) explains how an individual can request exclusion from the class, (7) explains how a class member can object to the Settlement, (8) discloses the time and place of the final approval hearing, and (9) displays the contact information for class counsel and the Settlement Administrator and advises that either may be contacted to answer questions about the Settlement. (Doc. 18-5; *see also* Doc. 18-4 at 21.) The Notice Packet does not reference or describe the "Voiding the Agreement" section of the Settlement Agreement, under which Anders retains the right to void the settlement if more than 10% of the Class Members opt-out of the settlement.[11]

The Court finds that the notice and the manner of notice proposed by Plaintiff meets the requirements of Federal Civil Procedure Rule 23(c)(2)(B) and that the proposed mail delivery is appropriate under these circumstances.

**D.      Settlement Administrator and Settlement Administration Costs**

The parties have agreed to retain CPT Group, Inc. to handle the notice and claim administration process. (Doc. 18-4 at 10.)

The estimated cost of administering this settlement is "not to exceed $20,000," which will be deducted from the Gross Settlement Amount. (*Id.* at 7, 18.) This estimate is consistent with, and in some cases lower than, other settlements submitted to this court. *See, e.g., Castro*, 2020 WL 1984240, at *19 (administration costs of $15,000 for a $3.75 million settlement); *Gonzalez v. CoreCivic of Tennessee, LLC*, No. 1:16-cv-01891-DAD-JLT, 2020 WL 1475991, at *14 (E.D. Cal. Mar. 26, 2020) (administration costs of $15,000 for a $3.2 million settlement); *Dakota Med., Inc. v. RehabCare Grp., Inc.*, No. 1:14-cv-02081-DAD-BAM, 2017 WL 1398816, at *5 (E.D. Cal. Apr.

---

[11] In light of relevant case law, the Court preliminarily deems this "blow up" provision reasonable, fair, and adequate. *See Dynabursky v. Alliedbarton Security Services, LP*, No. 8:12-cv-02210-JLS-RNB, 2016 WL 8921915, at *13, *2 n.1 (C.D. Cal. Aug. 15, 2016) (granting preliminary approval of a settlement agreement involving a blow up clause with a 10% opt-out threshold); *Four In One Co., Inc. v. S.K. Foods, L.P.*, No. 2:08-cv-03017-KJM-JDP, 2014 WL 28808, at *8, *14 (E.D. Cal. Jan. 2, 2014) (granting preliminary approval of a settlement agreement involving a blow up clause with a 25% opt-out threshold); *del Toro Lopez v. Uber Technologies, Inc*., No. 4:17-cv-06255-YGR, 2018 WL 5982506, at *25 (N.D. Cal. Nov. 14, 2018) (granting final approval of settlement agreement involving a blow up clause with a 5% opt-out threshold); *Jones v. Canon Business Solutions, Inc*., No. 2:12-cv-07195-JAK-JEM, 2014 WL 12772083, at *5, *16 (C.D. Cal. Sept. 2, 2014) (granting final approval of a settlement agreement involving a blow up clause with a 10% opt-out threshold); *see also Medina v. NYC Harlem Foods Inc.*, No. 1:21-cv-01321-VSB, 2022 WL 1184260, at *6 (S.D.N.Y. Apr. 21, 2022) ("Blow-up provisions thus encourage settlement by allowing defendants to limit their potential liability. Blow up provisions also give plaintiff's counsel leverage to negotiate the strongest possible settlement to discourage opt outs.") (internal citation omitted).

19, 2017) (administration costs of $94,000 for a $25 million settlement); *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 117789, at *7 (E.D. Cal. Jan. 11, 2017) (administration costs of $45,000 for a $4.5 million settlement).

Accordingly, the court will appoint CPT Group, Inc. as the Settlement Administrator.

**E.      Implementation Schedule**

Plaintiff has proposed an implementation schedule which may be summarized by the below table:

| Event | Date |
|---|---|
| Deadline for Anders to provide the Settlement Administrator with an updated list of Class Members ("Class Data") | Fourteen (14) calendar days after the date of service of entry of the Preliminary Approval Order |
| Deadline for the Settlement Administrator to send a Notice Packet to each Class Member | Five (5) business days after receipt of the Class Data |
| Deadline to file a Opt-Out Letter, objection to the Settlement, or a dispute related to the stated number of overtime hours worked during the Settlement Class Period | Sixty (60) calendar days after the initial mailing of the Notice Packet (the "Response Deadline") |
| Deadline for Anders to exercise right to rescind settlement if 10% or more of the Class Members opt-out | Fourteen (14) calendar days after expiration of the Response Deadline |
| Deadline for Anders to deposit with Settlement Administrator the Gross Settlement Amount plus Ander's share of payroll taxes | Ten (10) business days after Final Effective Date, as defined in the Settlement Agreement (the "Deposit Date") |
| Deadline for Plaintiff to dismiss her individual FLSA claim | The Deposit Date |
| Deadline for Settlement Administrator to issue checks to Class and Aggrieved Employees | Ten (10) calendar days after the Deposit Date |
| Deadline for recipients to cash Settlement Checks | One hundred eighty days (180) from the date of mailing |
| Deadline for Plaintiff to file a motion for final approval | Twenty-eight (28) days before the final approval hearing |

(*See* Doc. No. 18-4 at 16, 19, 20, 21, 23, 27; Doc. 18-6 at 3.)   However, the Court makes the following adjustments to the parties' proposed implementation schedule.   First, the Court adds a deadline for the Settlement Administrator to send a cure letter to Class Members who submit a

27

defective Opt-Out Letter, which shall be three business (3) days after receipt of a defective request for exclusion.  Second, the Court changes the deadline for the parties to file a motion for final approval to be at least 35 days in advance of the final approval hearing, in accordance with Local Rule 230(b).  With these adjustments, the Court will approve the parties' proposed implementation schedule.

## V.    CONCLUSION

Accordingly:

1.     Plaintiff's motion for preliminary approval of class action settlement (Doc. 18) is granted;

2.     The proposed class identified in the Settlement Agreement (Doc. 18-4) is certified for settlement purposes;

3.     Plaintiff's counsel, Matthew B. Hayes and Kye D. Pawlenko of Hayes Pawlenko LLP, are appointed as class counsel for settlement purposes;

4.     The named plaintiff Lisa Swain is appointed as class representatives for settlement purposes;

5.      CPT Group, Inc. is approved as the settlement claims administrator;

6.     The proposed notice (Doc. 18-5) is approved in accordance with Federal Rule of Civil Procedure 23;

7.     The proposed settlement (Doc. 18-4) detailed herein is approved on a preliminary basis as fair and adequate;

8.     The hearing for final approval of the proposed settlement is set for **May 3, 2023, at 9:30 a.m**. before Magistrate Judge Sheila K. Oberto in Courtroom 7, with the motion for final approval of class action settlement to be filed at least 35 days in advance of the final approval hearing, in accordance with Local Rule 230(b);

9.     Among other things the parties deem appropriate, the parties are direct to provide the Court with the information in footnotes 4, 7, 8, 9, and 10 in connection with Plaintiff's motion for final approval of class action settlement; and

10.    The settlement implementation schedule set forth above, as modified by the Court,

28

1        is adopted.

2    IT IS SO ORDERED.

3    Dated:    **October 5, 2022**                    */s/ Sheila K. Oberto*
4                                              UNITED STATES MAGISTRATE JUDGE

29